UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
SOUTHERN DIVISION
LONDON

BETTY BURNETT,
EXECUTRIX OF THE ESTATE OF
HERMAN BURNETT,

     PLAINTIFF,

v.

AIG LIFE INSURANCE CO.,

     DEFENDANT.

)
)
)
)
)
)
)
)
)
)
)
)
)

No. 6:08-CV-322-HAI

**MEMORANDUM
OPINION AND ORDER**

\*\*\* \*\*\* \*\*\* \*\*\*

Plaintiff Betty Burnett brings this action pursuant to the Employment Retirement Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 *et seq.*, against Defendant AIG Life Insurance Company. She seeks to recover benefits as a result of the death of her husband, Herman Burnett, under the Accidental Death and Dismemberment Insurance Policy which AIG issued to Plaintiff's employer, Sodexho Marriott Services, Inc. Presently pending before the Court is Plaintiff's Motion for Judgment Overturning the Administrative Decision. (D.E. 15). AIG denied Plaintiff's claim for benefits pursuant to an exclusion for loss resulting from suicide or intentionally self-inflicted injury. For the reasons that follow, the Court concludes that Defendant's decision to deny benefits was arbitrary and capricious, and the matter is **REMANDED** to Defendant for a full and fair review.

## I. Background

On December 19, 2004, Herman Burnett died from a gunshot wound to the head. (Administrative Record at 135) (filed in the record under seal at D.E. 14). He suffered that fatal injury while sitting in the driver's seat of his 1995 Jeep Cherokee, at his home in Kettle Island,

Kentucky.  On or about January 6, 2005, Plaintiff submitted a claim for benefits under Defendant

AIG's Accidental Death and Dismemberment (AD&D) Insurance Policy (the "Policy"), which

her employer offered as an employment incident.  (*Id.* at 51).  Defendant gathered documents

pertinent to Plaintiff's claim for benefits.  On March 3, 2008, Defendant notified Plaintiff by

letter that the company would provide no benefits, citing certain policy provisions:

> Accidental Death Benefit: If injury to the Insured Person results in death within
> 365 days of the date of the accident that caused the injury, the Company will pay
> 100% of the Principal Sum.
>
> Injury means bodily injury: (1) which is sustained as a direct result of an
> unintended, unanticipated accident that occurs while the injured person's
> coverage under the Policy is in force; and (2) which directly (independently of
> sickness, disease, mental incapacity, bodily infirmity or any other cause) causes a
> covered loss.
>
> General Exclusions: No coverage shall be provided under this Policy and no
> payment shall be made for any loss resulting in whole or in part from, or
> contributed to by, or as a natural and probable consequence of any of the
> following excluded risks even if the proximate or precipitating cause of the loss
> is an accidental bodily injury:
>
> 1.    suicide or any attempt at suicide or intentionally self-inflicted injury or
>        any attempt at intentionally self-inflicted injury or auto-eroticism.

(*Id.* 352).  The Summary Plan Description (SPD)[1] states more succinctly that the plan "will not

cover any loss caused by or resulting from . . . suicide (or any attempt at suicide) or intentionally

self-inflicted injury (or any attempt at self-inflicted injury).  (*Id.* at 374).  Dissatisfied with this

result, Plaintiff sent an appeal letter to Defendant on April 14, 2008. (*Id.* at 40).  Defendant

responded on August 19, 2008, by requesting additional documentation for the appeals process.

(*See* D.E. 10-4 at 8).  Defendant did not overturn its decision to deny benefits.

---

[1] Pursuant to 29 U.S.C. § 1022, a summary plan description (SPD) of any employee benefit plan shall: be
furnished to participants and beneficiaries; include certain information; be written in a manner calculated
to be understood by the average plan participant; and shall be sufficiently accurate and comprehensive to
reasonably apprise such participants and beneficiaries of their rights and obligations under the plan.

Plaintiff filed suit on September 3, 2008, asserting that AIG breached its contractual obligations under the Policy. (*See* D.E. 1-3 at 2). On October 6, 2008, Defendant removed the suit to federal court, based on 28 U.S.C. §§ 1331 and 1332. (*See* D.E. 1). The parties then consented to the jurisdiction of a U.S. Magistrate Judge for all proceedings herein. (D.E. 5-2). On July 28, 2011, the matter was reassigned to the undersigned.

## II. Standard of Review

### A. *Varying Standards of Review under ERISA*

The Court has ruled that ERISA governs this action, despite Plaintiff's arguments to the contrary. (*See* D.E. 12). The parties dispute which standard of review the Court should apply in this case. Plaintiff contends that the Court should review Defendant's decision to deny benefits *de novo*, while Defendant argues that the arbitrary and capricious standard of review should apply. "Although ERISA creates a cause of action for plan participants to challenge a plan administrator's benefits determination, it does not specify the judicial standard of review applicable to such actions." *Shelby County Health Care Corp. v. Majestic Star Casino*, 581 F.3d 355, 365 (6th Cir. 2009). The court must therefore decide which of two standards of review applies, arbitrary and capricious or *de novo*.

As the U.S. Supreme Court held in *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989), "a denial of benefits challenged under [ERISA] is to be reviewed under a *de novo* standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *See also Kovach v. Zurich Am. Ins. Co.*, 587 F.3d 323, 328-29 (6th Cir. 2009) (discussing standard of review); *Glenn v. MetLife. Ins. Co.*, 461 F.3d 660, 666 (6th Cir. 2006) (applying standard of review).

Thus, "[w]hen a plan affords discretion to an administrator or fiduciary, the arbitrary and capricious standard of review applies." *McCartha v. National City Corp.*, 419 F.3d 437, 441

(6th Cir. 2005); *see also Pierce v. Kentucky Utilities Company's Long Term Disability Plan*, 357 F.Supp.2d 979, 987 (E.D. Ky. 2005) (arbitrary and capricious standard applies "if the plan documents contain language granting the administrator or a fiduciary discretion to construe plan language or interpret plan terms."). For the reasons that follow, the Court finds that the arbitrary and capricious standard of review applies.

> *B. Because AIG is a Fiduciary, Arbitrary and Capricious is the Appropriate Standard of Review*

The SPD states that "[AIG] retains sole, absolute, and final discretion to determine entitlement to benefits, to construe the terms of the policy, and to resolve any factual issues relevant to benefits." [Adm. R. at 382]. Further, Plaintiff acknowledges that "all of the entitlement decisions were made by *AIG* under the express authority granted to it by the Plan." (D.E. 15-1 at 9) (emphasis in original). The parties therefore agree that the plan grants AIG the discretion to determine entitlement to benefits, to construe the terms of the policy, and to resolve any factual issues relevant to benefits. The Court's selection of a standard of review then turns on whether AIG is an administrator or a fiduciary under ERISA.

"According to ERISA, a plan 'fiduciary' is one who 'exercises any discretionary authority or discretionary control respecting the management of [an ERISA] plan or exercises any authority or control respecting the management or disposition of its assets' or who 'has any discretionary responsibility in the administration of such plan." *Chiera v. John Hancock Mutual Life Ins. Co.*, 3 F. App'x 384, 389 (6th Cir. 2001) (quoting 29 U.S.C. § 1002(21)(A)). The Sixth Circuit has further held that "[w]hen an insurance company administers claims for an [ERISA] plan and has the authority to grant or deny the claims, the company is an ERISA 'fiduciary' under 29 U.S.C. § 1002(21)(A)(iii)." *Hill v. Blue Cross and Blue Shield of Mich.*, 409 F.3d 710, 716 (6th Cir. 2005) (quoting *Libbey-Owens-Ford Co. v. Blue Cross and Blue Shield Mut. Of Ohio*, 982 F.2d 1031, 1035 (6th Cir. 1993)). AIG is therefore a fiduciary with respect to the

ERISA plan at issue here, and because the parties agree that AIG had discretion to determine entitlement to benefits in this case, the Court must review AIG's decision under the arbitrary and capricious standard.[2]  *See Firestone*, 489 U.S. at 115; *McCartha*, 419 F.3d at 441.

The case of *Benham v. Disability Portion of Life and Disability Plan*, 6 F. App'x 280 (6th Cir. 2001), is instructive.  In *Benham*, the ERISA plan at issue named the plaintiff's employer as the Plan Administrator.  The insurer, on the other hand, possessed "significant discretionary authority in the plan's administration, including the authority 'to determine . . . eligibility for benefits and to interpret the terms and provisions of the policy' when making benefit determinations."  *Benham*, 6 F. App'x at 282.  The Sixth Circuit rejected the district court's determination that the insurer was the *de facto* administrator of the plan, and concluded instead that "it is clear that [the insurer] is a plan fiduciary."  *Id.*  The Court further concluded that "because the plan's plain language grants [the insurer] discretionary authority to determine eligibility for benefits, its decision to deny [the plaintiff's] claim for . . . benefits is reviewed under the arbitrary and capricious standard."  *Id.* (citing *Firestone*, 489 U.S. 101, 115); *see also Chiera*, 3 F. App'x at 384 (concluding that the defendant insurance company in that case was "a fiduciary for purposes of ERISA inasmuch as it had a role in administering the plan because it had authority to accept or reject claims for losses . . .", but holding that *de novo* review was appropriate to the absence of a clear grant of discretion).[3]

---

[2]  Although the SPD apparently grants discretion to both the employer Sodexho and the insurer/fiduciary AIG, the SPD clarifies the division of labor among them.  Sodexho is granted "sole, absolute, and final discretion to determine eligibility for plan benefits, to construe the terms of the plan, and to resolve any factual issues relevant to eligibility."  (Adm. R. at 382).  AIG retains "sole, absolute, and final discretion to determine entitlement to benefits, to construe the terms of the policy, and to resolve any factual issues relevant to benefits."  (*Id.*).  A bifurcated appeals process described in the SPD supports this construction, as AIG adjudicates appeals regarding benefit determinations, while Sodexho adjudicates appeals regarding eligibility to participate.  (*Id.* at 377-78).

[3]  Plaintiff argues that because the plan administrator (Sodexho) lacked the discretion to determine entitlement to benefits, discretion which AIG specifically reserved for itself, the Court should review

Review for arbitrariness or capriciousness "is the least demanding form of judicial review of administrative action . . . . When it is possible to offer a reasoned explanation, based on the evidence, for a particular outcome, that outcome is not arbitrary or capricious." *Perry v. United Food & Commercial Workers Dist. Unions 405 & 442,* 64 F.3d 238, 241 (6th Cir. 1995) (citations and internal quotation marks omitted); *Mathis v. Mahle, Inc.*, 165 F. App'x. 457, 462 (6th Cir. 2006) (case in which arbitrary and capricious standard applied with equal force to decision to deny benefits for self-inflicted injury). Therefore, under the arbitrary and capricious standard, the Court will uphold a plan administrator's decision "if it is the result of a deliberate, principled reasoning process and if it is supported by substantial evidence." *Balmert v. Reliance Standard Life Ins. Co.*, 601 F.3d 497, 501 (6th Cir. 2010) (citing *Baker v. United Mine Workers of Am. Health & Ret. Funds*, 929 F.2d 1140, 1144 (6th Cir. 1991)); *Morgan v. SKF USA, Inc.*, 385 F.3d 989, 992 (6th Cir. 2004) ("We must accept a plan administrator's rational interpretation of a plan even in the face of an equally rational interpretation offered by the participants.").

Nonetheless, "Substantial evidence is more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Jolliff v. NLRB*, 513 F. 3d 600, 607 (6th Cir. 2008) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938). And in spite of the deference owing to a fiduciary, the Court is mindful that "the federal courts do not sit in review of the administrator's decisions only for the purpose of rubber stamping those decisions." *Balmert*, 601 F.3d at 501 (quoting *Moon v. Unum Provident Corp.*, 405 F.3d 373, 379 (6th Cir. 2005)). Rather, the standard requires the court to review "the quality and quantity" of the evidence supporting Defendant's decision. *Kovach*, 587 F.3d at 327 (quoting *McDonald v. Western-Southern Life Ins. Co.*, 347 F.3d 161, 172 (6th Cir. 2003)).

---

AIG's decision *de novo*. (D.E. 15-1). But this argument essentially asks the Court to read the role of fiduciaries out of the statute, and out of *Firestone* and its progeny, which of course it cannot do.

*C. AIG's Conflict of Interest*

Where a plan fiduciary both evaluates claims for benefits and pays benefits claims, it operates under a conflict of interest, and the Court weighs that conflict as a factor in determining whether the administrator abused its discretion. *Metropolitan Life Ins. Co. v. Glenn*, 554 U.S. 105, 112 (2008); *Loan v. Prudential Ins. Co. of America*, 370 F. App'x 592, 594 (6th Cir. 2010). Despite Defendant's assertion to the contrary, a conflict of interest exists here because Defendant serves as both the insurer and plan fiduciary for its policy with Sodexho. *See Glenn*, 554 U.S. at 114-15 (when an insurance company is also a plan administrator, " . . . [w]e nonetheless continue to believe that for ERISA purposes a conflict exists"); *Miller v. Metro. Life Ins. Co.*, 925 F.2d 979, 984 (6th Cir. 1991) ("Because an insurance company pays out to beneficiaries from its own assets rather than from the assets of a trust, its fiduciary role lies in perpetual conflict with its profit-making role as a business, and the conflict of interest is substantial."). The Court therefore weighs this conflict as a factor in evaluating whether Defendant's denial of benefits was arbitrary or capricious.

*D. Scope of Review.*

Review of AIG's decision is "confined to the record that was before the plan [fiduciary]." *Corum v. Hartford Life and Acc. Ins. Co.*, 553 F.Supp.2d 800, 804 (E.D. Ky. 2008) (citing *Wilkins v. Baptist Healthcare System*, 150 F.3d 609, 615 (6th Cir. 1998); *see also Cooper v. Life Ins. Co. of North America*, 486 F.3d 157, 171 (6th Cir. 2007) ("The Court is to conduct its review 'based solely on the administrative record.'"). The Court may consider the parties' arguments concerning the proper analysis of the evidentiary materials in the administrative record, but it may not admit or consider any evidence not presented to the administrator. *See Wilkins*, 150 F.3d at 619.

### III. The Administrative Record

*A. The Kentucky State Police Death Investigation*

       *1. Report by KSP Detective Mitchell Williams*

Dispatchers directed KSP Detective Mitchell Williams to Herman Burnett's home at 10:00 p.m. on the night of the shooting. (Adm. R. 136). It was the beginning of an investigation that would span more than two years. Williams wrote the following synopsis in a Uniform Offense Report:

> Herman Burnett and Jerry Elliott were parked in Herman Burnett's drive way (sic) drinking. They were in Herman's 1995 Jeep Cherokee. Jerry got out to urinate and heard a noise he describes as a slapping sound, or something hitting on something. Jerry says that the vehicle started moving forward and he ran and jumped in the moving vehicle. The Jeep marred (sic) up in the mud approximately 30 yards down the drive. Jerry raised Herman's head up and blood started running out. Herman Burnett had a gunshot wound to his head. Herman's pistol was in the passenger floor.

(Adm. R. at 135). Williams stated in his report that the incident occurred on December 19, 2004, at approximately 9:10 p.m. (*Id.*).

The following information is taken from the case file that Detective Williams compiled. (*Id.* at pp. 135-38). Williams inspected Herman Burnett's Jeep and noted that "Herman Burnett was located in the driver's seat of this vehicle and was leaned forward and against the driver's side door." The vehicle's motor was running, and the radio and windshield wipers were on. Williams observed a Keltec P-11 nine-millimeter pistol and an empty Seagrams 1.75 liter bottle on the front passenger floor. One spent nine-millimeter shell casing, or "hull," rested on the front passenger seat. Williams ordered the Jeep towed and locked up "in order to process it at a later time and in the light." Although it is unclear which officer did so, Williams notes that "[b]ags were placed on Mr. Burnett's hands for GSR[4] purposes." Officers who reached the scene before Williams had placed Jerry Elliott in their cruiser. Williams ordered that Elliott be

---

[4] GSR stands for Gunshot Residue.

taken be taken to a hospital to "obtain a blood kit," and also to "do a GSR on him while they were there."

Detective Williams photographed the scene, including all the evidence inside the vehicle and the blood spatter. Williams noted that there was "an enormous amount of blood throughout the vehicle's front and on the right exterior side." Williams photographed Herman Burnett's body inside the vehicle, and directed another officer to photograph "the surrounding area and the location where they were originally parked up drinking." Williams collected both the spent nine-millimeter hull and the Keltec P-11 nine-millimeter pistol into evidence. When Williams "ran a NCIC check" on the pistol, "[i]t came back no[t] stolen and shows that [Herman] Burnett has a carrying concealed weapon license." A forensic report later showed that Herman Burnett's pistol was in working condition, and that the spent nine-millimeter hull found on the passenger seat of Herman Burnett's Jeep had been fired from that pistol. (*Id.* at 148).

Detective Williams then interviewed Herman Burnett's son, Herman Keith Burnett ("Keith"), and Herman Burnett's brother, Lee Roy Burnett. Both men told Williams that Herman Burnett's wife "has been trying to get disability due to a back injury," and that she had been out of work for five months. The men told Williams that Herman Burnett "has been upset lately over his brother Gary Burnett being in prison," and that Herman Burnett "worries about Gary's wife and baby because they are having a hard time right now." Keith Burnett also told Williams that "Herman has had several accidental discharges of his weapons in the past," and pointed out several bullet holes in the walls and doors, which Williams apparently observed. Both Keith and Lee Roy Burnett told Williams that "Jerry Elliott is like a brother to Herman and that there is no way Jerry would hurt Herman."

Detective Williams then went to the Bell County Ambulance Service, where he examined and photographed Herman Burnett's body. Williams noted that the entry wound to Herman

Burnett's forehead appeared to be a contact wound with "obvious starring."  Williams located the exit wound at the back of Herman Burnett's head.  Williams "obtained a GSR on Mr. Burnett," and the body was sent to Frankfort for autopsy.

At 2:00 a.m., Williams interviewed Jerry Elliott at the KSP field office.  Elliott related the following information:

> Jerry Wayne Elliott stated that Herman picked him up during the daylight.  They went to Herman's residence and took two shots of whiskey while at his carport.  He said that Herman got some eggs from the chickens and then they backed up behind Herman's house toward the chickens.  Jerry said they sat there drinking from a liter of Seagram's.[5]  Jerry said that it wasn't full, but they drank most of what was in it.  Jerry said that they talked about Herman's dad and when he was a little kid.  They talked about his kids and grandkids.  Jerry said that Herman said he would pay him $300 to underpin his buildings.  Jerry said that Herman seemed depressed lately but he never heard him say he wanted to kill himself.  Jerry said he got out of the Jeep to take a leak and walked around behind it.  He said he heard what he guessed was a bang.  He said it sounded more like something hit something, like a smack.  He said the Jeep started moving forward and he ran and jumped in.  Jerry said the Jeep got in the mud and Herman was leaned over the steering wheel.  Jerry said he lifted Herman's head up and blood ran out.  Jerry said that Herman has let guns go off before and they said it was by accident, he didn't know.

 (*Id.* at 137).  Williams photographed the blood on Jerry Elliott's clothing.  Although there were no blood spatters on his clothing, "[t]here was a large amount of blood on the left rear of his pants," which Williams noted was consistent with the large amount of blood on the left side of the passenger seat in the Jeep.  (*Id.*).

Williams later re-examined Herman Burnett's Jeep.  Based on the blood evidence, Williams noted that it appeared Herman Burnett had been looking toward the right (or passenger) side window when the gun was fired, with his head "possibly positioned near the left center of the vehicle."  On a sketch which appears in the case file, Williams apparently estimates

---

[5]    According to a Kentucky State Police toxicology analysis report, Jerry Elliott's blood alcohol concentration was .27 gm/100mL at 1:15 a.m. on the night Herman Burnett died.  (Adm. R. 162).

that Herman Burnett's head was positioned over the gap between the driver's seat and the center console at the time the fatal shot was fired. (*Id.* at 156).

### 2. Autopsy of Herman Burnett

On the morning after Herman Burnett died, Dr. Gregory J. Davis conducted a postmortem examination of the body at the Centralized Laboratory Facility in Frankfort, Kentucky. The following information is drawn from Dr. Davis's report. (*Id.* at pp. 208-10). Dr. Davis described a "tight contact apparently medium caliber gunshot wound" to the head as evidence of the injury. Like Detective Williams, Dr. Davis noted that "[m]ultiple radiating lacerations up to 1.5 inches in greatest diameter confer a stellate (starburst) appearance to the wound." (explanatory parenthetical in original). Dr. Davis further opined that the "Contact, Exiting Medium Caliber Gunshot Wound of Head" caused Herman Burnett's death. Dr. Davis' report states that Herman Burnett's blood alcohol concentration was 0.215 gm/100 ml, his vitreous alcohol concentration was 0.229 gm/100 ml, and that hydrocodone was detected in his urine. Dr. Davis appears to have signed the final version of the report on February 22, 2005.

### 3. Gunshot Residue Test Results

Although the autopsy confirmed that the contact gunshot wound to the forehead caused Herman Burnett's death, it remained unclear who, if anyone, had been holding the pistol when the fatal shot was fired. Detective Williams submitted gunshot residue test kits to the KSP's Central Forensic Laboratory in Frankfort, Kentucky, on December 23, 2004. (*Id.* at pp. 160-61). Zenobia Middleton Skinner, a Forensic Scientist Specialist at the lab, apparently completed the test on January 28, 2005, and produced a forensic report describing the results. Skinner's report describes the material submitted for testing as "swabs" that officers had taken from the hands of both Herman Burnett and Jerry Elliott. The swabs were then tested for identification of gunshot residue, including the presence of three elements: barium, antimony, and lead.

The gunshot residue test results were inconclusive.  On swabs that Detective Williams had taken from both of Herman Burnett's palms and the back of his right hand, significant amounts of antimony and lead were detected, but significant amounts of barium were not detected.  On a swab Detective Williams took from the back of Herman Burnett's left hand, significant amounts of antimony were detected, but no significant amounts of barium or lead were detected.  The following disclaimer plainly appears on the test results:

> * This is not indicative of gunshot residue nor does it eliminate the possibility that the subject handled a firearm, discharged a firearm or was in close proximity to a discharging weapon.

(*Id.* at 161).  The gunshot residue test results on swabs taken from Jerry Elliott's hands were also inconclusive, revealing that no significant amounts of antimony, barium, or lead were detected on any of the swabs.  The same disclaimer follows those results as well: while not indicative of gunshot residue, the result does not eliminate the possibility that the subject handled a firearm.  The gunshot residue tests as to both Herman Burnett and Jerry Elliott were therefore inconclusive.

### 4. Williams's Follow-up Investigation

#### i. A Bullet Hole in Herman Burnett's 1995 Jeep Cherokee

On January 13, 2005, Herman Burnett's son, Keith Burnett, contacted Detective Williams, and asked him to re-examine the 1995 Jeep Cherokee in which his father had died.  (*Id.* at 149).  Williams states that:

> Mr. [Keith] Burnett showed me where they had found  a bullet hole in the visor on the driver's side of the jeep.  I took photographs of the vehicle's interior to show the location of the bullet hole.  New carpet had been put in the jeep and the interior had been cleaned.
>
> I looked in the visor and removed bullet fragments at 1115 hours.  Photos were taken.  Also in the visor were fragments from a key that was in the visor.  The key was pushed through the visor as the bullet passed through.  The fragments were packaged and sent to the crime lab and attached to the evidence in this case for examination.

I have no further information at this time.

(*Id.*).

The resulting forensic report, completed January 27, 2006, reveals that one of the metal fragments Williams found in the visor had indeed been fired from Herman Burnett's Keltec P-11 nine-millimeter pistol; the other fragments could not be conclusively identified. (*Id.* at 147). Williams had previously determined that the bullet which killed Herman Burnett had traveled through his head and through the driver's side window, shattering it, and had thus left the vehicle. (*Id.* at 138). This is also apparent from a sketch Williams prepared of the incident. (*Id.* at 156).

Williams recovered the bullet fragments from the visor on January 13, 2005. Yet according to the KSP evidence log, Herman Burnett's pistol was not returned to his son Keith until July 19, 2007. (*Id.* at 169). It therefore stands to reason that the bullet hole was made in the visor sometime before, and certainly not after, Detective Williams took the pistol into evidence on December 19-20, 2004, but no further specificity exists in the record.

### ii. *Allegations of Foul Play*

Keith Burnett contacted Detective Williams in late December 2005, approximately one year after Herman Burnett's death, to report information concerning that death. (*Id*. at 150). Williams memorialized their discussion as follows:

> I called Keith, and he informed me that [Herman Burnett's brother] Gary Burnett gave him information that Jimmy Wayne Helton was drinking with Jerry Elliott and Jerry said that he shot Herman. Jimmy supposedly said that Herman got out of the Jeep to use the bathroom. When he got back in Jerry had gotten the gun off the dash. He said that Herman tried to get the gun and it went off. Jimmy Wayne Helton is approximately 18-19 years old.

> Keith Burnett said that Herman might have been having an affair with Jerry Elliott's wife, Diane. Keith said that his mother had found a note that was written to Herman by Diane Elliott. Keith said that Herman grabbed the note and tore it up. Keith also told me that Gary Burnett told him that Jerry pulled a gun on Herman and Diane over a racing jacket Herman had bought for her.

Other information that Keith told me was that the neighbors Bill Mitchell and Bobby Lynn Saylor heard Herman and Jerry arguing on the night of the shooting.

I have talked with Herman Burnett's wife on near a dozen occasions. She has never mentioned anything about this note during our conversations. Mrs. Burnett has often asked about the lab results and needing a cause of death to get a death certificate for life insurance purposes. I referred Mrs. Burnett to deputy coroner Bill Bisceglia to get a copy of the death certificate. I have also talked with Keith Burnett many times more than I have his mother. Mention of the affair has never been mentioned (sic).

(*Id.*).

On March 23, 2006, Detective Williams followed up with Plaintiff Betty Burnett. (*Id.* at 142). Plaintiff told Williams that in July 2004 she had discovered in her husband's possession a note which read "D.G. loves H.B." inside a heart. Plaintiff told Williams that she had asked Diane Elliott if she was having an affair with Herman and Diane had denied it. Plaintiff said that Jerry was present when she asked, and that "they pretty much let it go and left it behind them." Plaintiff told Williams that "Jerry didn't think anything was going on," and that Herman Burnett was worried about her disability. Plaintiff also told Williams that Jerry Elliott had been helping Herman Burnett around the house, that she "didn't know of anything they were mad at each other over." She further stated that she never saw Herman and Diane together, and Herman never told her they were having an affair. Williams also observed that Plaintiff was recording the interview with a tape recorder "without our knowledge." (*Id.*).

On April 6, 2006, Detective Williams also contacted Bobby Lynn Saylor, the neighbor who had reportedly heard Jerry Elliott arguing with Herman Burnett the night he died.[6] (*Id.* at 150). Ms. Saylor refused to sign a written statement, or to give a taped statement, and told Williams she did not want him to come to her residence. (*Id.* at 144). But she apparently

---

[6] Bill Mitchell, whom Keith Burnett had also named as someone who overheard Jerry Elliott and Herman Burnett arguing, reportedly said that he was watching television and "didn't hea[r] anything." (*Id.* at 144).

discussed the case with Williams by phone, and told the detective that on the night Herman Burnett died she had heard "what sounded like a gunshot." (*Id.*). Saylor said she "heard another sound and thought it may have been another gunshot," but that the sound "could have been [Herman Burnett's] Jeep running into the ditch." Saylor also told Williams that "she didn't hear any arguing, at all, between Jerry and Herman." Saylor told Williams that she saw Herman Burnett and Jerry Elliott together and "they went back to where the chickens were," that Herman's window was down and he waived at her, and that it had been cold that night. (*Id.*).

Despite repeated calls, Detective Williams was at first unable to locate Jimmy Wayne Helton, the man to whom Jerry Elliott had allegedly confessed shooting Herman Burnett; Keith Burnett described Helton as "hard to find." (*Id.* at 143; 145). On April 8, 2006, another officer interviewed Helton, who gave a hand-written statement that read:

> App [sic] 4 months ago
>
> Sitting at the pool with an unknown friend[,] Jerry Elliott pulled up in a white car [and] begin talking. Said they were going to charge him for what happened with Herman. I asked him what happened [and] he said that they were fighting earlier in the day over Jerry's wife and they both went to their homes. Jerry said that he then went back to Herman's and got into a vehicle. Said they then got struck while they were drinking [and] Herman got out to look. Jerry stated that Herman jumped back in the vehicle and a gun that was on the dash fell into the floorboard. Jerry stated that both went after it [and] it went off. Jerry said after it happened he ran in the house and told Betty.

(*Id.* at 141).

Detective Williams interviewed Jerry Elliott on April 27, 2006. (*Id.* at 140). The record includes a KSP form titled Statement of Your Rights, which appears to be a *Miranda* waiver form signed by Jerry Elliott. Notes from the interview do not appear in the record, but it does not appear that Jerry Elliott was ever charged in connection with Herman Burnett's death.

*iii.  Detective Williams's Conclusion*

Detective Williams ultimately determined that "the conclusion of this investigation is death by ***accidental*** gunshot."  (*Id.* at 139) (emphasis added).  Williams and another officer presented their findings to Plaintiff and her son Keith on March 4, 2007, just over two years and two months after Hermann Burnett's death.  Williams's investigation supplement states as follows:

> In reviewing this case, and all of it's contents, it is apparent that Jerry Elliott did not fire a weapon at the time of Herman Burnett's death.  GSR reports indicate that Herman Burnett had residue on his hands.[7]  I determined, after interviewing Herman's family, that he was shot with his own weapon.  During my interview with the family, I realized that there has been a pattern, over a period of years, of Herman accidentally discharging his firearms inside the house and in other areas.  There were numerous bullet holes inside the residence that had been repaired over time.

> The blood spatter patterns, and the evidence at the scene, are consistent with statements given by Jerry Elliott.  The blood spatters are also consistent with Herman Burnett firing the weapon while seated in the driver's seat.

> There is no evidence to determine if this was a[n] intentional, self-inflicted, wound.  There were no indications that Herman Burnett was depressed or had contemplated suicide.  However, there is a history of accidental gunfire by the victim.  The conclusion of this investigation is death by accidental gunshot.

(*Id.* at 139).

*B.  The Deputy Coroner's Opinion*

Deputy Coroner Bill Bisceglia apparently disagreed with Detective Williams's conclusion that Herman Burnett's death was accidental.[8]  Herman Burnett's death certificate, initially filed in December 13, 2005,  listed the manner of death as "pending investigation."[9]  (*Id.*

---

[7] This is incorrect; the gunshot residue test results were inconclusive.  *See infra* at § III.A.3; (Adm. R. at 160-61).  Whether Detective Williams merely disagreed with that result, or merely misread the forensic report, is not in the record.

[8] The record contains notes by AIG claims consultant Amber Mounger, who apparently spoke with Bisceglia by phone in August 2007.  Plaintiff does not dispute the veracity of these notes.

at 184).  By the Summer of 2007, KSP's death investigation had ended, making the "pending investigation" designation no longer accurate, and therefore an amendment was apparently needed.  On August 20, 2007, however, Bisceglia reportedly stated that "he does not feel that the cause of death should be ruled as an accident, as the gunshot that killed [Herman Burnett] was a contact gunshot wound," and that he would discuss the case with the State Medical Examiner before determining the manner of death.  (*Id.* at 129).

On August 27, 2007, Bisceglia reportedly stated that he had decided to submit an amendment to Herman Burnett's death certificate to the effect that the manner of death could not be determined.  (*Id.* at 126).  Bisceglia confirmed this decision on September 11, 2007.  (*Id.* at 122).  The amended death certificate therefore states that the manner of Herman Burnett's death "could not be determined," rather than suicide, homicide, or accident.  (*Id.* at 114)[10].  Herman Burnett's death certificate therefore does not reflect Detective Williams's conclusion that the death was an accident.

### C.  Defendant's Decision to Deny Benefits

On March 3, 2008, Defendant notified Plaintiff by letter of its decision that no benefits were payable.  (*Id.* at pp. 42-43).  Defendant stated that it relied on the following documents in reaching its decision: the claim form Plaintiff submitted; certified copies of the death certificates (both original and amended); a copy of the complete KSP report, including the supplement containing Detective Williams's conclusion; a copy of the autopsy and toxicology reports dated

---

[9] A Commonwealth of Kentucky Certificate of Death offers six options for recording the manner of death: natural; accident; suicide; homicide; pending investigation; and could not be determined.

[10] Nor did Bisceglia's information about the manner of Herman Burnett's death come exclusively from the pages of Dr. Davis' autopsy.  The case notes of Detective Williams place Bisceglia at Herman Burnett's home, in the aftermath of the shooting, on the night of December 19-20, 2004.  (*Id.* at 136).

February 22, 2005; investigating officer's statement dated April 27, 2007;[11] forensic laboratory examination with gunshot residue analysis dated January 28, 2005; and a coverage opinion dated December 19, 2007.

Defendant's letter denying benefits does not mention Detective Williams's conclusion that the manner of Herman Burnett's death was an accidental shooting. (*Id.* at pp. 42-43). Rather, the letter focuses on the deputy coroner's reported disagreement with that conclusion, described above. Defendant's letter denying coverage also states, without accompanying analysis, that Herman Burnett's blood alcohol concentration was 0.21, and that his vitreous alcohol concentration was 0.22. Defendant describes at length the conclusion local counsel reached in a coverage opinion dated December 19, 2007. (*Id.* at pp. 63-79).[12] The coverage opinion is quoted to say that "counsel believes that the company may reasonably conclude that coverage for the loss is excluded because of the evidence of starring around the entry wound from the flash of the gun and the results of residue on his hand suggest that [Herman] Burnett intended to shoot himself, regardless of whether he intended to die, which is sufficient evidence to hold the shooting was not accidental." The letter denying benefits substantially concludes with this reasoning:

> After careful review of the information received, we have concluded that no benefits are payable as this Policy specifically excludes any loss resulting in whole or in part from, or contributed to by, or as a natural and probable consequence of suicide or any attempt at suicide or intentionally self-inflicted injury or any attempt at intentionally self-inflicted injury.

---

[11] The record reflects that AIG claims consultant Amber Mounger spoke with Detective Williams on several occasions, including April 23, 2007, and with another officer on April 27, 2005. The Court cannot, however, locate any statement made on April 27, 2007.

[12] Plaintiff also points out that Defendant's letter denying benefits contains a typographical error, (mis)stating that Herman Burnett's autopsy revealed a blood alcohol concentration of .0215 grams per 100 milliliters (sic). The correct figure is .215 gm/100mL, not .0215 gm/ 100mL. But this can hardly have been a significant error, since the correct figure appears elsewhere in the letter and the concentration figures are scarcely elaborated upon in the denial-of-benefits letter.

*Id.* at 43.

D. *Plaintiff's Appeal*

Plaintiff appealed the denial of benefits, arguing that other evidence "leads one to believe that [Herman Burnett's] death was either an accident or that foul play was involved." (*Id.* at 40). Specifically, Plaintiff states:

> There was another individual in the vehicle with my husband who had a strong motive to do him harm. A neighbor stated that she heard my husband and this individual arguing at the time of the incident. There was a second gunshot into the driver's side visor and roof of the vehicle and the vehicle was in drive at the time that the fatal shot occurred. The other man had ample time to hide or discard any evidence that there might have been (His car which was sitting in my driveway was never searched by the police). He came into my house and washed his hands and sat down as if in shock and started watching television. When I asked him where my husband was and went out to check, he followed me. I found my husband in the car unconscious and bleeding. When I went to call 911, he got in the car with him and locked himself in, hugging my husband and saying how sorry he was. When the ambulance and police arrived they had to force him out of the vehicle. According to the police, by that time the man had soaked his shirt in blood, which made it impossible to determine whether there was blood splatter present. He was arrested, but the case was not strong enough to prosecute him due to insufficient evidence and case mishandling. The suspect has made his brags to other people about how he shot my husband and refuses to take a police polygraph.
>
> My husband's death was not ruled a suicide and the police report does not state this. My husband displayed no sign of depression. He was looking forward to family coming to visit for Christmas. As is evident by the length of time (3 yrs) it has taken to receive an official death certificate, there are too many extenuating circumstances in this case to assume that this was a suicide and I would like to request that you reconsider your judgment. I have consulted with an attorney and we will be waiting for your response.

(*Id.* at 40).

Plaintiff's appeal letter described some facts not supported by the record. Plaintiff's assertion that Jerry Elliott had a strong motive to harm Herman Burnett is undercut by statements she, Keith Burnett, and Lee Roy Burnett made to Detective Williams. Plaintiff stated that the blood on Jerry Elliott's clothing made it impossible for Detective Williams to discern the presence of blood spatter, but that is contradicted by Williams's statement that the blood on

Elliott's clothing was consistent with Elliott's story that he was not in the vehicle when the fatal shot was fired. Plaintiff wrote that Jerry Elliott was "arrested," but the record indicates only that he was detained for questioning after the shooting, and questioned later. The record does not affirmatively demonstrate that an arrest was made. Plaintiff further stated that Herman Burnett "displayed no sign of depression," and was looking forward to family coming to visit for Christmas, yet Jerry Elliott told Williams that Herman Burnett had seemed depressed lately. (*Id.*). Thus, Plaintiff's appeal letter essentially requested that Defendant revisit its conclusion that Herman Burnett's death was suicide.

### *E. The Supplemental Coverage Opinion*

Defendant sought a supplemental coverage opinion "in light of additional materials submitted in [Plaintiff's] appeal of the denial of benefits under the AD&D policy." (*Id.* at 14-17). Local counsel's supplemental coverage opinion cast doubt on Plaintiff's assertions described above, although counsel acknowledged that some evidence could be interpreted as indicative of an accidental shooting. Ultimately, however, counsel concluded that the shooting was suicide, pointing to the existence of a contact wound and the presence of gunshot residue on Herman Burnett's hands.

On August 19, 2008, Defendant sent Plaintiff a copy of the supplemental coverage opinion, and a letter stating "[w]e will continue with the appeals process and advise whether there is sufficient documentation to overturn our original decision or whether the claim denial will be upheld." (*Id.* at 11). Plaintiff filed suit on September 3, 2008.

## IV. Analysis

Plaintiff argues that the issue before the Court is "whether AIG's determination that Herman Burnett's death was a suicide or was the result of an intentionally self-inflicted gunshot wound was correct." (D.E. 15-1 at 9). But because the Court reviews Defendant's decision

under the arbitrary and capricious standard that is incorrect. Instead, the Court must analyze whether Defendant reached its conclusion that Herman Burnett's death was suicide through a principled, reasoned process, and whether that conclusion was based on substantial evidence. *Balmert*, 601 F.3d at 501; *Mathis*, 165 F. App'x. at 462 ("Assuming the plausibility of Mathis's explanation of his injuries, we must nonetheless defer to [the plan fiduciary]" so long as it is possible to offer a reasoned explanation based on the evidence.). Plaintiff argues that the administrative record "simply provides no adequate basis for AIG's denial of benefits[.]" (D.E. 15-1 at 9). Accordingly, the Court must analyze the quality and quantity of the evidence supporting Defendant's decision. *See Kovach*, 587 F.3d at 327.

Plaintiff argues that the gunshot residue test showed that Herman Burnett did not have gunshot residue on his hands, undercutting Defendant's determination of suicide, and that the record is more consistent with a theory of accident or homicide than with suicide. Defendant asks the Court to uphold its benefits decision, arguing that its decision to deny benefits was not arbitrary or capricious. For the reasons that follow, the Court holds that Defendant's decision to deny benefits in this case was arbitrary and capricious.

*A. Defendant Unreasonably Concluded that Herman Burnett's Death was a Suicide.*

When a plan fiduciary relies on inconclusive, unreliable evidence, and ignores contrary evidence, the resulting decision is arbitrary and capricious. *See Glascoe v. Central States, Southeast & Southwest Areas Pension Fund*, 35 F. App'x 121, 124-25 (6th Cir. 2002) ("By relying on . . . inconclusive, unreliable evidence and by ignoring . . . contrary evidence, Central States arbitrarily and capriciously denied Glascoe's pension claim."); *see also Buffonge v. Prudential Ins. Co. of America*, 426 F.3d 20, 30 (1st. Cir. 2005) ("An administrator's decision must be 'reasoned' to survive 'arbitrary and capricious' review . . . and we cannot say that a decision relying on multiple pieces of faulty evidence was "reasoned.") (citation omitted).

Although courts should "rightfully defer to rational and reasonable decisions, when a plan administrator bases its decision on unreliable evidence," a court must reject that decision. *Mathis v. Mahle, Inc.*, 165 F. App'x 457, 462 (6th Cir. 2006) (Clay, J., dissenting) (citations omitted). Here, Defendant relied extensively on an assumption about what the deputy coroner believed was the true manner of death, and on an incorrect interpretation of Herman Burnett's gunshot residue test results. Because this evidence was unreliable and inconclusive, Defendant's decision to deny benefits was arbitrary and capricious.

Defendant's conclusion that Herman Burnett committed suicide was based in large part on two pieces of evidence. First, the fatal gunshot wound was delivered while Herman Burnett's pistol was touching his forehead, and therefore was a "contact wound" which suggested suicide. Second, "gunshot residue tests showed that [Herman Burnett] had [gunshot] residue on his hands." (Adm. R. at 42). Although Herman Burnett died from a contact gunshot wound to the forehead, which is surely relevant when discussing a possible suicide, Defendant bolsters that fact by saying that "[t]he Coroner did not feel the cause of death should be ruled as an accident, as the gunshot wound that killed [Herman Burnett] was a close contact wound." (*Id.*). But it does not necessarily follow, as Defendant apparently assumes, that the deputy coroner believed Herman Burnett intentionally committed suicide. And, as Plaintiff points out, the deputy coroner never expressed an opinion that the manner of death was suicide, he merely expressed doubt as to whether it was an accident.

Ultimately, the amended death certificate lists the manner of death as "could not be determined." If the other opinions expressed in the record overwhelmingly pointed to suicide, the inferential leap might not appear so great. But where the police investigation concludes that the shooting death was accidental, it simply does not suffice for Defendant to attribute to the deputy coroner opinions he did not express in the record as a counterweight to Detective

Williams's conclusion that Herman Burnett's death was accidental. The evidentiary weight of the contact wound is lessened by a lack of objective evidence that Herman Burnett held the pistol when the fatal shot was fired. This heightens the importance of the gunshot residue test results.

Defendant's assertion that the KSP found "gunshot residue" on Herman Burnett's hands is even more troublesome to the Court because that conclusion is not supported in the record. As described above, the forensic examiner concluded that the elements on Herman Burnett's hands were "not indicative of gunshot residue nor does it eliminate the possibility that the subject handled a firearm, discharged a firearm or was in close proximity to a discharging weapon." (*Id.* at 160-61). Plaintiff attacks Defendant's heavy reliance, in explaining its decision to deny benefits, upon an incorrect reading of the Kentucky State Police gunshot residue test, stating that "there is simply no basis for AIG unilaterally ignoring the results of the KSP testing." (D.E. 15-1 at 10). But the misreading was not really unilateral; KSP Detective Williams appears to have made the same mistake. (*See* Adm. R. at 139) (stating that "GSR reports indicate that Herman Burnett had residue on his hands.").

Nevertheless, Defendant mistakenly relied on this interpretation when making its decision to deny benefits. Then Defendant failed to correct its mistake when Plaintiff appealed. This oversight also casts doubt on the validity of local counsel's coverage opinion, which accepted and relied upon the mistaken fact of gunshot residue on Herman Burnett's hands. That does not, however, excuse Defendant's error. *See Calvert v. Firstar Finance, Inc.*, 409 F.3d 286, 296-97 (6th Cir. 2005) (finding, in the disability benefits context, that when an insurer relies on a file reviewer's opinion in support of a decision to deny benefits, but the physician reviewer's findings do not "square with" the objective results of certain objective tests performed, it supports a finding that the insurer acted arbitrarily and capriciously).

Because Defendant's decision to deny benefits in this case was predicated to a large degree on incorrect and inconclusive factors, it was not reasoned, and was therefore arbitrary and capricious. It is important to note the Court does not find that the manner of Herman Burnett's death was accident or homicide. Indeed, upon a more thorough and even-handed review by AIG, the record may support a determination that Herman Burnett committed suicide. As the Seventh Circuit stated in one ERISA benefits case where an administrator's finding inadequately supported its position, "[the] decision to deny [the] claim was arbitrary and capricious, but not necessarily wrong." *Quinn v. Blue Cross and Blue Shield Ass'n* 161 F.3d 472, 478 (7th Cir. 1998). The Court reaches the same conclusion here.

*B. Defendant is Precluded from Asserting a Different Basis for Denying Coverage in These Proceedings*

Defendant predicated its decision to deny benefits on a policy exclusion which essentially stated that no benefits would be paid if Herman Burnett committed suicide or if his death was the result of an intentionally self-inflicted injury. (Adm. R. at pp. 42-43). Although Defendant's letter explaining its decision to deny benefits listed several facts, the actual basis for the denial reads as follows:

> After careful review of the information we received, we have concluded that no benefits are payable as this Policy specifically excludes any loss resulting in whole or in part from, or contributed to by, or as a natural and probable consequence of suicide or any attempt at suicide or intentionally self-inflicted or any attempt at intentionally self-inflicted injury.

(*Id.* at 43).

As an alternative ground for upholding its decision, however, AIG now argues that Herman Burnett's death was not accidental, and is therefore not covered under the Policy, because "it is both subjectively expected and objectively foreseeable that aiming and discharging a firearm at one's own head would result in death." (D.E. 16 at 19). The Court has determined that Defendant's basis for concluding that Herman Burnett held the gun was flawed, and the

Court is therefore not persuaded by this argument. Defendant also argues that, "assuming *arguendo* that Burnett did not place the gun to his head, but he was handling the firearm, his death would not be considered an accident because a reasonable person would have understood the dangerous circumstances created by handling a firearm while intoxicated . . . ." (*Id.*).

Yet Defendant is precluded from relying on this argument because it was not a basis upon which Defendant denied coverage during the administrative decision-making process. 29 U.S.C. § 1133 states, in pertinent part, that "every employee benefit plan shall provide adequate notice in writing . . . setting forth the specific reasons for such denial, written in a manner calculated to be understood by the participant[.]" Defendant's letter explaining the denial of coverage mentions that Herman Burnett was intoxicated when he suffered the fatal gunshot wound, (Adm. R. at 42), but it does not state what Defendant now argues, which is apparently that Herman Burnett's death was not accidental if he was handling a firearm while intoxicated. This is a critical distinction.

When a claim for benefits is denied, an insurer may not offer a different justification in the resultant judicial proceeding than it did when explaining its coverage decision. *See Kellogg v. Metro Life Ins. Co.*, 549 F.3d 818, 828-29 (10th Cir. 2008). In *Kellogg*, the beneficiary died after a car wreck. *Id.* at 820. A witness had told police officers that it appeared the beneficiary had suffered a seizure as he lost control of the vehicle. *Id.* The claims administrator then denied a claim for death benefits on the grounds that the loss resulted from a physical illness, and was therefore not covered by operation of an exclusion in the policy. *Id.* at 829. In proceedings before the district court, the claims administrator argued the beneficiary was not entitled to benefits because the death was not accidental. *Id.* at 828. The Tenth Circuit, however, held that the district court erred in granting summary judgment to the administrator on the basis of a non-accidental death because the physical illness exclusion was the basis for the administrator's

denial. *Id.* at 829. In *Shelby County Health Care Corp. v. Majestic Star Casino*, 581 F.3d 355, 368-69 (6th Cir. 2009), the Sixth Circuit similarly held, relying on the reasoning of *Kellogg*, that a plan administrator "is precluded from asserting a different basis for denial in the judicial proceedings[,]" than that relied upon in the denial letter. *Id.* at 369.

Applying *Kellogg* and *Shelby County Health Care Corp.*, the Court must look to the language of the letter Defendant sent to Plaintiff denying coverage. Although Defendant's denial letter mentions Defendant's elevated blood alcohol concentration, like the denial letter in *Kellogg* it cannot reasonably be interpreted as denying coverage on the basis Defendant now wishes to assert. The letter does not state that denial was based upon Herman Burnett's death being non-accidental. At this stage, Defendant is precluded from relying on a basis other than the exclusion for suicide or intentionally self-inflicted injuries.

### C. Defendant's Reliance on Racknor is Misplaced

Defendant relies on another case involving "puzzling and mysterious circumstances" in support of its position, arguing that *Racknor v. First Allmerica Financial Life Ins. Co.*, 71 F.Supp.2d 723 (E.D. Mich. 1999) is analogous to the present case. (D.E. 16 at 23). The facts of *Racknor* are, at first blush, analogous. The plaintiff in *Racknor* sought to recover benefits under an accidental death plan, but Defendant asserted that the insured had committed suicide. *Racknor*, 71 F.Supp.2d at 725. The insured was found dead in his vehicle with a gunshot wound to his head. *Id.* The medical examiner wrote on the death certificate that the immediate cause of death was a "head wound," but that it was "undetermined" whether that condition resulted from an accident, suicide, or homicide. *Id.* The autopsy revealed "a gunshot wound to the head with a contact entrance wound in his mouth, presence of soot on his tongue and palate, perforation of his skull and brain, and an exit wound on right side of his head." *Id.* at 726.

According to Defendant, *Racknor* is analogous for the following reasons: the Plan Administrator denied benefits pursuant to an exclusion for suicide, although the plaintiff contested that decision by arguing foul play; the administrative record included a death certificate that listed the manner of death as "undetermined," in spite of the fact the insured died from a contact gunshot wound; the police report concluded that the insured "died as a result of a self-inflicted gunshot wound to the head," (D.E. 16 at 23); and "interviews performed by the police department revealed that the insured appeared depressed days prior to his death." (*Id.*). Defendant states that the court in *Racknor* concluded that the plaintiff had failed to offer any substantive reason for concluding that the administrative record was internally inconsistent, that the plan administrator overlooked some significant piece of evidence, or that the insurer acted in bad faith. "Like *Racknor*," Defendant argues, "the investigative documents relating to Burnett's death state he suffered a gunshot wound to the head, the cause of which was "unknown" and "could not be determined." (*Id*. at 24).

While some facts are similar, *Racknor* is distinguishable. In *Racknor*, the Sheriff's Department concluded not only that the wound was self-inflicted, as Defendant states, but also explicitly concluded the death in question was suicide, explaining to the victim's family that "it could have only been self-inflicted." *Id.* at 727. The Sheriff's Department also reviewed the case with an expert in private practice who concurred that the manner of death was suicide, and with a member of the "Violent Crime Unit," who agreed the death was a suicide and "[can't] be anything other." *Id.* In this case, however, the KSP investigator concluded that Herman Burnett's death was accidental. (Adm. R. at 139). The opinion as to manner of death is therefore materially different in *Racknor* than in this case. The court in *Racknor* also determined that the plaintiff in that case had offered no substantive reason for concluding that the administrative record was internally inconsistent, or that the plan administrator overlooked a

significant piece of evidence. *Racknor*, 71 F.Supp.2d at 729. Here, by contrast, Defendant misjudged a critical piece of evidence, the gunshot residue test results, when making its decision to deny benefits.

Essentially, Defendant relies on *Racknor* for the proposition that, when the death certificate states that the manner of death cannot be determined, and the mechanism of injury is a contact gunshot wound to the head which could be consistent with suicide, an administrator or fiduciary's determination of suicide reviewed under the arbitrary and capricious standard is entitled to deference. Yet the significant differences between *Racknor* and the record now before the Court render *Racknor* unpersuasive.

## V. Remedy

In ERISA cases, a court may either send the matter back to the plan fiduciary for further consideration or make a final decision on the merits. *See Kovach v. Zurich American Ins. Co.*, 587 F.3d 323, 339 (6th Cir. 2009) (citing *Cook v. Liberty Life Assurance Co.*, 320 F.3d 11, 24 (1st Cir. 2003) ("Once a court finds that an administrator has acted arbitrarily and capriciously in denying a claim for benefits, the court can either remand the case to the administrator for a renewed evaluation of the claimant's case, or it can award a retroactive reinstatement of benefits.").

In *Elliott v. Metro. Life Ins. Co.*, 473 F.3d 613 (6th Cir. 2006), the Sixth Circuit explained that "where the 'problem is with the integrity of [the plan's] decision-making process,' rather than 'that [a claimant] was denied benefits to which he was clearly entitled,' the appropriate remedy generally is remand to the plan administrator." *Elliott*, 473 F.3d at 622 (quoting *Buffonge v. Prudential Ins. Co. of Am.*, 426 F.3d 20, 31 (1st Cir. 2005). Although the Court has determined that Defendant's decision to deny benefits was arbitrary and capricious, on this record Plaintiff is not clearly entitled to benefits. The Court therefore remands this matter to

Defendant for a full and fair review of its benefits determination consistent with this Opinion and Order.  *See Elliott¸* 473 F.3d at 622-23.

## VI. Conclusion

Accordingly, and for the reasons set forth herein, the Court hereby **ORDERS** as follows:

1.      Plaintiff's Motion for Judgment Overturning the Administrative Decision (D.E. 15) is **GRANTED**; and

2.      This matter is **REMANDED** to Defendant for findings consistent with this Order.

3.      This matter is **DISMISSED** and **STRICKEN** from the Court's active docket.

4.      After a new determination regarding Plaintiff's application for benefits under the Policy has been made by Defendant on remand, Plaintiff may challenge that determination upon motion to the Court.  *Bowers v. Sheet Metal Workers Nat'l Pension Fund*, 365 F/3d 535, 537 (6th Cir. 2004).

This the 30th day of March, 2011.

Signed By:

*Hanly A. Ingram*

United States Magistrate Judge